UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

PATRICK NAYYAR,

             Defendant.

------------------------------------X

09 Cr. 1037 (RWS)

SENTENCING OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6 5 13

**Sweet, D.J.**

       On March 27, 2012, Patrick Nayyar ("Nayyar" or the "Defendant") was convicted of the following counts: (i) Count One: conspiracy to provide material support or resources to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B; (ii) Count Two: providing material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B; (iii) Count Three: agreeing to provide Hizballah, a designated foreign terrorist organization, with guns, ammunition, vehicles, bulletproof vests and night vision goggles in violation of 50 U.S.C. § 1705(a) and 31 C.F.R. 595.204 & 595.311; (iv) Count Four: providing Hizballah, a designated foreign terrorist organization, with a handgun, a box of ammunition and a pick-up truck in violation of 50 U.S.C. §

1705(a) and 31 C.F.R. §§ 595.204, 595.205 & 595.311; and (v) Count Five: conspiring to traffic in firearms and ammunition, not being licensed in such business matters, and shipped the goods in interstate commerce, in violation of 18 U.S.C. §§ 922(a)(1)(A), 922(a)(1)(B) and 922(a)(5).

For the reasons set forth below, the Defendant will be sentenced to a term of imprisonment of fifteen years.

**Prior Proceedings**

On February 17, 2012, superseding indictment S1 09 CR 1037 (RWS) was filed in the Southern District of New York, charging the following six counts:

Count One charged that from at least July through September 2009, in the Southern District of New York and elsewhere, Nayyar and an individual named Conrad Stanisclaus Mulholland ("Mulholland") conspired with other individuals to provide "material support or resources, as that term is defined in 18 U.S.C. § 2339A(b)(1), to Hizballah, a designated foreign terrorist organization pursuant to Section 219 of the

Immigration and Nationality Act. Specifically, Nayyar, Mulholland and others agreed to provide Hizballah with guns, ammunition, vehicles, bulletproof vests and night vision goggles and did provide Hizballah with a handgun, ammunition and a pick-up truck, knowing that Hizballah has engaged in terrorist activity, in violation of 18 U.S.C. § 2339B.

Count Two charged that from at least July through September of 2009, in the Southern District of New York and elsewhere, Nayyar and Mulholland provided "material support or resources," including weapons, ammunition and vehicles, to Hizballah, a designated foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that Hizballah has engaged in terrorist activity, in violation of 212(a)(3)(B) of the Immigration and Nationality Act, in violation of 18 U.S.C. § 2339B.

Count Three charged that from at least July through September of 2009, in the Southern District of New York and elsewhere, Nayyar and Mulholland agreed with others to provide Hizballah with guns, ammunition, vehicles, bulletproof vests and night vision goggles, in violation of 50 U.S.C. § 1705(a) and 31 C.F.R. §§ 595.204, 595.205 and 595.311.

Count Four charged that from at least July through September of 2009, in the Southern District of New York and elsewhere, Nayyar and Mulholland, along with others, provided Hizballah, through a confidential informant working with the FBI, with a handgun, a box of ammunition and a pick-up truck, in violation of 50 U.S.C. § 1705(a) and 31 C.F.R. 595.204, 595.205 and 595.311.

Count Five charged that from at least July through September of 2009, in the Southern District of New York and elsewhere, Nayyar, Mulholland and others conspired to traffic in firearms and ammunition, not being licensed in such business matters, and shipped the goods in interstate commerce, in violation of 18 U.S.C. §§ 922(a)(1)(A), 922(a)(1)(B) and 922(a)(5).

Count Six charged that from at least August 3, 2009, through August 5, 2009, in the Southern District of New York and elsewhere, Nayyar, being an alien who was illegally in the United States, possessed a Colt Delta Elite Auto Handgun and 48 Winchester 10mm, automatic, subsonic, 180 grain, jacketed hollow point bullets, which previously had been transported in

interstate and foreign commerce, in violation of 18 U.S.C. § 922(g)(5).

As noted above, on March 27, 2012, Nayyar was convicted on Counts One through Five of the superseding indictment. Nayyar's sentencing is currently scheduled for June 6, 2013.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a) ("§3553"), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed —
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
>
> (5) any pertinent policy statement . . . [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 114-15.

**The Defendant**

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to the Defendant's personal and family history.

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that document.

In early 2009, the FBI and the New York Joint Terrorism Task Force initiated an investigation of Nayyar and Mulholland, who agreed to provide weapons, ammunition and vehicles to Hizballah, a U.S. designated foreign terrorist organization based in Lebanon.

In 2000 and 2001, Nayyar commenced a relationship with a Romanian national named Romulus Zakaria. Nayyar and Zakaria became friends, and Zakaria suggested that Nayyar become involved in weapons-trafficking. Zakaria further told Nayyar that he had contacts in Romania who could supply weapons.

Zakaria provided Nayyar with an arms catalogue for a company called Orion, which catalogue detailed pages of military-grade weapons, including automatic firearms and rocket launchers. Thereafter, in late 2000 or early 2001, Nayyar traveled to Bucharest, Romania, where he met with representatives of a company called Romtechnica, which was involved in the manufacture and sale of weapons. Nayyar and Zakaria continued to discuss starting a weapons-trafficking business until the events of September 11, 2001, at which point Nayyar decided to discontinue weapons-trafficking.

In July 2009, Nayyar approached a confidential informant ("CI") working with the FBI to collect money owed to Nayyar by the CI. Nayyar previously had indicated to the CI that he was involved in a scheme shipping leased heavy construction machinery overseas and then reporting it as stolen. During that conversation, Nayyar told the CI that he wanted to use the CI's contacts in Lebanon to get into "bigger" business. When the CI inquired about what the business was, Nayyar stated that he had contacts in Russia who could provide S-300 missiles and sophisticated Global Positioning Systems ("GPS"). In a subsequent conversation, the CI informed Nayyar that Hizballah needed construction equipment for their war effort and Nayyar

agreed that he could export the leased construction equipment to aid Hizballah.

Thereafter, the CI was equipped with a concealed body recording device and engaged in consensually recorded meetings with Nayyar over the course of the next six weeks. During the investigation, the CI recorded approximately 10 separate meetings with Nayyar and Mulholland. In those meetings, Nayyar stated that he could acquire various arms, including sniper rifles, missiles, vehicles, bullet proof vests, and night vision goggles, which he could sell to the CI who could, in turn, provide them to Hizballah.

In the course of those meetings, Nayyar and Mulholland made repeated references to the need for secrecy and security. For example, in the first consensually recorded meeting, Nayyar told the CI that they should use code words when discussing their transactions. Nayyar further indicated that it might become necessary for him to leave the country if anything went wrong. Similarly, Mulholland encouraged the CI and Nayyar to remove the batteries from their telephones during their meetings, and further instructed them to be careful using the Internet and not to search for certain terms on the Internet as

that might alert the authorities.

Several more meetings were held from August 8, 2009, up until Nayyar's arrest in September 2009. During those meetings, Nayyar, Mulholland, and the CI discussed obtaining bulletproof vests, night vision goggles, M-18 Claymore mines, M-16 rifles, Uzis, and missiles. During those meetings Nayyar provided the CI with printouts of specifications regarding an M-18 Claymore mine as well as specifications from a U.S.-based company known as ATN, pertaining to night-vision goggles.

Throughout August 2009 and into September 2009, several meetings were held between the CI, Nayyar and Mulholland, all of which were recorded. At those meetings, the parties discussed obtaining various weapons and other equipment for use by Hizballah. Nayyar and Mulholland also sold a handgun, a box of ammunition, and a Ford pickup truck to the CI, believing that those materials would be sent to Hizballah. Nayyar also represented himself as having various connections with both foreign and domestic arms dealers.

In September 2009, Nayyar was arrested by the FBI. At the time of his arrest, searches were conducted of Nayyar's

apartment and that of his mother, where he had met with the CI on at least two separate occasions to show the CI the firearm that he ultimately sold to the CI. In the course of the searches, the FBI recovered several boxes of ammunition (both hollow-point and full metal jacket), the original version of the Orion arms catalogue, several rounds of spent ammunition that appeared to have been used to test a bullet proof vest or armor plate, correspondence with Romtechnica regarding Nayyar's prior attempts to engage in arms-trafficking, flight vouchers showing that Nayyar previously had traveled to Romania, and several documents. In addition, the FBI recovered Nayyar's laptop computer, which, as described below, contained additional evidence of Nayyar's attempts to obtain bullet proof vests and other weapons.

Following his arrest, Nayyar was advised of his *Miranda* rights, agreed to waive those rights, and spoke with the Government. During his post arrest interview, Nayyar stated the following, in substance and in part, to the FBI:

Prior to conducting any deals with the CI, he called a friend, Mulholland, and told him about the potential business deals with the CI. Nayyar asked Mulholland to come to the

11

United States to coordinate the business deals.

Nayyar stated that he knew the CI was from Lebanon and believed that the CI had connections with Hizballah. Nayyar admitted that he believed the truck that he sold would be used by Hizballah for construction. He initially denied that he ever thought that the truck would be sent to Hizballah to carry missiles. Later in the interview, however, Nayyar admitted that he had conversations with the CI and with Mulholland – prior to the sale of the Ford truck – as to how many missiles the truck could carry. Nayyar also admitted that he believed that the truck was going to be sent to Lebanon to be used by Hizballah to carry missiles.

Nayyar also admitted to selling a firearm and a box of ammunition to the CI. Nayyar subsequently admitted that he told the CI to give the gun to the "Mullah" of Hizballah, and that the "Mullah" of Hizballah would love the gun and would want to buy many of them.

Nayyar admitted that he believed he was acquiring items for Hizballah. In addition, Nayyar stated that he had researched how to manufacture bulletproof vests in the past and

12

was hoping to start a bulletproof vest manufacturing business to provide those vests to Hizballah. Nayyar had spoken with his brother about the manufacturing of the vests in India, but did not inform his brother that the vests would be sent to Hizballah. According to Nayyar, Mulholland was to be responsible for traveling to Lebanon to meet with people and assist with shipping needs inside Lebanon.

Nayyar further admitted that he knew that Hizballah was a terrorist organization. He stated that he lied about his connections in the United States in order to make the CI believe that he was an actual weapons dealer. Nayyar also claimed that he and Mulholland were going to obtain night vision goggles in upstate New York to sell to the CI for use by Hizballah.

A search of Nayyar's phone at the time of his arrest revealed that he had a number saved in his phone that was listed as "ATN." Nayyar told the FBI that that was a company that he had contacted in order to try to obtain night-vision goggles to sell to the CI. As noted above, in September 2009, Nayyar provided the CI with a printout of technical specifications for night-vision goggles obtained from a company called ATN.

The FBI searched Nayyar's laptop.  Although Nayyar had set the laptop to delete his browsing history after each use, by implementing the FBI's forensic search software, the FBI was able to recover a number of websites and other documents that Nayyar had accessed on his computer.  Specifically, the FBI recovered portions of websites from the "free space" on Nayyar's computer showing that Nayyar had used Internet search engines to research how to manufacture bullet proof vests, and accessed several websites that sold bullet-proof vests and other related equipment.  The FBI also found remnants of an article pertaining to Hizballah, which clearly explained that Hizballah was a terrorist group responsible for terrorist attacks throughout the world.

On September 23, 2009, Nayyar was arrested in Brooklyn, NY.  As of the date of the PSR, Mulholland remained a fugitive.

**The Relevant Statutory Provisions**

For Counts One and Two, the maximum term of imprisonment is 15 years per count, pursuant to 18 U.S.C. §§ 2339B(a)(1) and (d)(1)(E).  For Counts Three and Four, the

14

maximum term of imprisonment is 20 years per count, pursuant to 18 U.S.C. §§ 2339B(a)(1) and (d)(1)(E). For Count Five, the maximum term of imprisonment is five years, pursuant to 18 U.S.C. § 371.

For Counts One through Five, the court may impose a term of supervised release of not more than three years per count, pursuant to 18 U.S.C. § 3583(b)(2).

For Counts One through Five, the Defendant is eligible for not less than one nor more than five years' probation per count by statute, pursuant to 18 U.S.C. § 3561(c)(1). Such terms of probation run concurrently, pursuant to 18 U.S.C. 3564(b).

For Counts One through Five, the maximum fine is $250,000 per count, pursuant to 18 U.S.C. § 3571. In addition, a special assessment of $100 per count, for a total of $500, is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines[1]**

Counts One through Four are all referenced to the same
section of the Guidelines (§2M5.3) and also involved the same
victim (Americans), and Count Five is referenced to §2K2.1.
These counts all represent integral aspects of the overall
common scheme or plan and involve two or more acts connected by
a common criminal objective and constituting a common scheme or
plan.  As such and pursuant to §3D1.2(b), Counts One through
Five are grouped together and will be known herein as "Group 1."

Further and pursuant to §3D1.3(a), the offense level
applicable to Group 1 is the highest offense level of the counts
contained in the group.  In this case, the guideline that
provides for the highest offense level is §2M5.3.

With respect to Group 1, the applicable guideline is
§2M5.3, and the base offense level is 26, pursuant to §2M5.3(a).

Since the Defendant conspired to sell firearms and
ammunition to Hizballah knowing that they would be used in

---

[1] The November 1, 2011 edition of the United States Sentencing
Commission Guidelines Manual has been used in this case for
calculation purposes.

furtherance of violence, the offense level is increased two
levels pursuant to §2M5.3(b)(1).

Pursuant to §3A1.4(a), because the offense involved,
or was intended to promote, a federal crime of terrorism, as
defined in 18 U.S.C. § 2332b(g)(5), the offense level is
increased by 12 levels.

Given the above, Nayyar's adjusted total offense level
for Group 1 is 40.[2]

The Defendant's relevant criminal history is as
follows:

- On August 7, 2008 the Defendant pleaded guilty to Petit
  Larceny in Criminal Court, Queens County, NY. Pursuant to
  §§ 4A1.1(c) and 4A1.2(e)(2), this results in one criminal
  history point.

The above conviction results in a subtotal criminal history
score of one. According to the sentencing table at Chapter 5,

---

[2] The Court exercises its discretion pursuant to §3C1.1 to
refrain from enhancing the Defendant's offense level despite the
Government's assertion that the Defendant "may have provided
false exculpatory testimony" during the court of his trial and a
hearing before the Court.

Part A of the Guidelines, one criminal history point establishes a Criminal History Category of I. However, because §3A1.4 (Terrorism) applies to this case, pursuant to §3A1.4(b), the defendant's Criminal History Category shall be Category VI.

Based on a total offense level of 40 and a Criminal History Category of VI, the guideline term is 360 months to life imprisonment. However, because no count of conviction carries a statutory maximum term of imprisonment of 30 years, the guideline term of imprisonment can be achieved by imposing a sentence where one or more counts run consecutively, pursuant to §5G1.2(d) and Application Note 1. As such, the guideline range for a term of imprisonment remains 360 to 900 months.

The guideline range for a term of supervised release is at least one years but not more than three years, pursuant to §5D1.2(a)(1). The Court shall order a term of supervised release when required by statute (§5D1.1(a)(1)), or except for a deportable alien who is likely to be deported after imprisonment, when a term of imprisonment of more than one year is imposed (§5D1.1(a)(2)).

Because the applicable guideline range is in Zone D of

the Sentencing Table, the defendant is not eligible for probation, pursuant to §5B1.1, application note #2.

The fine range for the instant offense is from $25,000 to $250,000, pursuant to §5E1.2(c). Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,407.78 to be used for imprisonment, a monthly cost of $286.11 for supervision, and a monthly cost of $2,180.27 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

With respect to the automatic enhancement to base

19

offense level and Criminal History Category triggered by §3A1.4 (the "Terrorism Enhancement"), the Court notes that the Second Circuit has stated regarding such an automatic enhancement it "can lead to unreasonable sentences that are inconsistent with what §3553 requires." United States v. Dorvee, 616 F.3d 174, 184 (2d Cir. 2010). In Dorvee, the Second Circuit overturned a sentence that had been imposed upon a defendant who was convicted of distribution of child pornography. In the course of its analysis of the reasonableness of the sentence imposed by the district court, the Circuit discussed the district court's application of §2G2.2, which is an automatic guidelines enhancement applied to crimes involving the trafficking of child pornography. The Circuit noted that blind adherence to the Guidelines with respect to enhancements under §2G2.2 could often result in the imposition of sentences that draw "no distinction" between "the most dangerous offenders" and those offenders who have little or no criminal history. Id. at 187. The Circuit additionally found that the resulting concentration of all offenders at or near the statutory maximum was a scenario "fundamentally incompatible with §3553(a)." Id.

The Circuit also noted that since, unlike other automatic enhancements, §2G2.2 was not based upon empirical data

20

developed by the Sentencing Commission, a sentencing court may conclude that §2G2.2's effect on the sentencing range for a particular type of conviction yields a sentence that is "greater than necessary" under the circumstances. Id. at 188. Thus, the Circuit cautioned district courts to exercise the "broad discretion they possess in fashioning sentences under §2G2.2 . . . bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." Id.

The same bases for concern that the Second Circuit articulated in Dorvee with respect to §2G2.2 are equally applicable to the Terrorism Enhancement that the Government suggests the Court apply to the Defendant here. First, the 12-level enhancement in overall offense level is the result of a congressional directive to the Sentencing Commission, rather than an organic outgrowth of the Commission's own empirical studies. See U.S.S.G. App. C, Amend. 526. Second, the language of the enhancement is so broad so as to encompass virtually every terrorism-related case, without distinguishing between those cases in which harm occurred and cases in which it did not.

This flaw also exists with respect to the two-level weapons enhancement, which applies broadly to any case where resources were provided with reason to believe that they "are to be used to commit or assist in the commission of a violent act." §2M5.3(b)(1)(E) ("Weapons Enhancement"). Since any organization that is deemed to be a terrorist organization under the statute is, by definition, considered to engage in violent acts, see 8 U.S.C. § 1182, the Weapons Enhancement applies to virtually every conviction for providing material support to a terrorist organization, without distinguishing between the ultimate harm caused by the offense conduct.

In the instant case, as the Government has acknowledged, there is "no claim here that the defendant is a terrorist. No one is arguing that the defendant was planning to blow anything up or commit any acts of violence." See Sentencing Memorandum Submitted on Behalf of Patrick Nayyar ("Nayyar Mem."), Ex. C. Accordingly, application of the Terrorism Enhancement to the calculation of Nayyar's offense level has the effect of obscuring the differences between Nayyar's offense conduct, which did not result in any actual harm, and an instance where such conduct did result in actual harm. Such a distinction has been found to be a legitimate

22

basis for imposing a lower sentence, even in a case involving terrorism offenses.  See United States v. Stewart, 590 F.3d 93, 139 (2d Cir. 2009) (holding that "it was not unreasonable for the district judge to decide that the fact that no injury in the case mitigated the gravity of [the defendant's] offense").  Application of the Terrorism Enhancement to Nayyar's sentence would have the ultimate effect of punishing him as harshly as someone who had actually committed acts of terroristic violence.

A similarly inequitable result would obtain if the Terrorism Enhancement were applied to increase Nayyar's Criminal History Category.  As noted above, Nayyar's actual Criminal History Category is Category I.  Sentencing Nayyar as if he actually had a Criminal History Category of VI would result in Nayyar being punished to the same extent as would be an offender with a lengthy and serious criminal record, who has demonstrated continual recidivism and a lack of ability to reform.  Mr. Nayyar's criminal past does not demonstrate such things, and it would therefore be inequitable to sentence him as if it did.  Moreover, the stated justification for the Terrorism Enhancement's automatic (and dramatic) enlargement of an offender's criminal history category – namely, that "even terrorists with no prior criminal behavior are unique among

23

criminals in the likelihood of recidivism, the difficulty of
rehabilitation, and the need for incarceration," United States
v. Meskina, 319 F.3d 88, 92 (2d Cir. 2001) – is wholly
inapposite here, where even the Government has openly and
expressly acknowledged that "there is no claim here that the
defendant is a terrorist." Nayyar Mem. Ex. C.  Indeed, the
Second Circuit has held that where the Terrorism Enhancement's
automatic enlargement of criminal history category over-
represents "the seriousness of the defendant's past criminal
conduct or the likelihood that the defendant will commit other
crimes," the sentencing court has discretion under §4A1.3 to
depart downward.  Meskina, 319 F.3d at 92.

Finally, although §5G1.2(d) calls for consecutive
sentences on multiple counts where necessary to reach the
Guideline range, the sentencing court retains discretion to
instead depart downward by sentencing concurrently rather than
consecutively.  See 18 U.S.C. §3584; United States v. Rahman,
189 F.3d 88, 156-57 (2d Cir. 1999); §5K2.0(a)(2).  In
particular, where, as here, the counts to run consecutively
describe essentially the same criminal conduct, a downward
departure has been held to be appropriate.  See Rahman, 189 F.3d
at 157.  As noted by the Second Circuit, "the prosecutor's

24

ability to lengthen sentences in these circumstances by simply adding essentially duplicative counts, each describing the same criminal conduct, is a circumstance that was not adequately considered by the Sentencing Commission when it devised the formula for consecutive sentencing under §5G1.2(d)."  Id.

Given the particular circumstances of this case that are identified above, in conjunction with the authority with respect to application of automatic enhancements, a downward departure from the Guidelines range is appropriate.

**The Sentence**

For the instant offenses, the Defendant will be sentenced to (i) a term of five years' imprisonment for Counts One and Two, to run concurrently with each other; (ii) a term of ten years' imprisonment for Counts Three and Four, to run concurrently with each other, and consecutive to Counts One and Two; and (iii) a term of imprisonment of five years for Count 5, to run concurrently to all other counts.  This yields a total term of imprisonment for all counts of 15 years.

As the Defendant is subject to deportation following

the conclusion of his custodial sentence, a term of supervised release is not imposed.

As mandatory conditions of his supervised release, the Defendant shall: (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; (4) refrain from any unlawful use of a controlled substance and submit to one drug testing within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer; and (5) cooperate in the collection of DNA as directed by the probation officer.

The standard conditions of supervision (1-13), set forth in the judgment, shall be imposed. In addition, the following special conditions shall be imposed: (a) the Defendant shall provide the probation officer with access to any requested financial information; (b) the Defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer; and (c) the Defendant shall obey the immigration laws and comply with the directives of immigration authorities.

The Defendant is ordered to report to the nearest Probation Office within 72 hours of release from custody.

A special assessment of $500, payable to the United States, is mandatory and shall be due immediately.

Due to the Defendant's limited assets, no fine is imposed.

The Defendant shall forfeit to the United States any and all property constituting and derived from any proceeds obtained directly or indirectly as a result of the instant offense, pursuant to 21 U.S.C. § 853. Pursuant to Rule 32.2, "[t]he Court must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at the sentencing. The Court must also include the forfeiture order, directly or by reference, in the judgment."

The Defendant has been detained without bail since his arrest, and he is not a candidate for voluntary surrender pursuant to the provisions found in 18 U.S.C. § 3143(a)(2).

27

It is so ordered.

**New York, NY**
**June** _/4_ **, 2013**

ROBERT W. SWEET
U.S.D.J.